IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BERNADINE GILPIN, an individual,

                        Plaintiff,                    CV-05-427-ST

          v.                            FINDINGS AND
                                          RECOMMENDATION

LAWRENCE A. SIEBERT and SAM KIMBALL,
doing business as PRACTICAL PSYCHOLOGY
PRESS, and LAWRENCE A. SIEBERT, an
individual, and MARY KARR, an individual,

                        Defendants.

STEWART, Magistrate Judge:

## **<u>INTRODUCTION</u>**

In her Third Amended Complaint, plaintiff, Bernadine Gilpin ("Gilpin"), alleges the

following claims against defendants Lawrence A. Siebert and Sam Kimball,[1] doing business as

_____

[1] Defendants allege that Sam Kimball has no interest or involvement in the business affairs of Practical Psychology Press which is an Oregon corporation.  Answer to Third Amended Complaint, ¶ 2.

1 - FINDINGS AND RECOMMENDATION

Practical Psychology Press, Lawrence A. Siebert ("Siebert") and Mary Karr ("Karr"):

> First Claim: Copyright Infringement on the workbook entitled *College Survival and Success*;
>
> Second Claim: Copyright Infringement on the instructional manual entitled *Teaching College Success to Adult Learners*;
>
> Third Claim: Failure of Duty to Account on the fourth and fifth editions of the book *The Adult Student Guide to Survival and Success*.

This court has subject matter jurisdiction of this action under 20 USC § 1338. Defendants have filed a Motion for Summary Judgment (docket #29) on the basis that Portland Community College ("PCC"), and not Gilpin, owns the copyrights on these works. For the reasons that follow, the Motion for Summary Judgment should be denied as to ownership of the copyrights, but granted as to those portions of Gilpin's claims which she has repudiated.

## LEGAL STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.  *Id* at 631.

## FACTS

A review of the parties' facts, as well as the other materials submitted by the parties, including declarations, exhibits and deposition excerpts, viewed in the light most favorable to Gilpin, reveals the following facts.

Gilpin was employed by PCC as a counselor from 1978 or 1979 until August 1995. Gilpin Depo, p. 8; Gilpin Decl, ¶ 4.  She specialized in the field of adult students returning to college.  Gilpin Depo, pp. 8-9.  As part of her counseling job duties, she also taught classes in career development, interviewing skills, writing resumes, *etc*.  *Id* at 9, 37. She did not teach every term or every day.  *Id* at 96.  Gilpin signed an employment contract with PCC which was subject to the provisions of an agreement between PCC and its teachers union ("Union Agreement").  Hubert Decl, Ex J.  The Union Agreement contained the following provisions in Article 28 relating to copyrights:

> 28.11   The ownership of any materials or processes developed solely by an employee's individual effort and expense shall vest in the employee and be copyrighted, if at all, in the employee's name.

> 28.12   The ownership of materials or processes produced solely for the College and at College expense shall vest in the College and be copyrighted, if at all, in its name.

> 28.13   In those instances where materials or processes are produced by an employee with College support, by way of use of significant

> personnel time, facilities or other College resources, the ownership
> of the materials or processes shall vest in (and be copyrighted, if at all) the person designated by written agreement between the parties entered into prior to the production. In the event there is no such written agreement entered into, the ownership shall vest in the College.

Hubert Decl, Exs L (September 1, 1986 - August 31, 1989), K (September 1, 1989 - August 31, 1992), & M (September 1, 1992 - August 31, 1995).

During the time she was employed by PCC, Gilpin and Siebert co-wrote a book aimed at helping older students return to college titled *Time for College* which was published in 1989. Hubert Decl, Ex A. p. 2. Seven years earlier in 1982, Siebert and Tim Walter ("Walter") co-authored a book titled *The Adult Student's Guide to Survival & Success* ("*ASG*"). *Id* at 1; Siebert Decl, ¶ 3. According to Gilpin, *Time for College* was a new book and not intended to be a second edition of *ASG* or referred to as such in any publication.[2]

Because *Time for College* did not benefit from good sales, the authors agreed that the title needed to be changed to clearly identify the book's content. Gilpin Decl, ¶ 10. The result was a derivative of *Time for College* called *The Adult Student's Guide to Survival & Success - Time for College* (2nd edition), which was co-authored by Gilpin and Siebert and published in 1992. *Id*; Hubert Decl, Ex A, p. 3.

Gilpin also appeared as co-author of further derivative books of *Time for College* titled *The Adult Student's Guide to Survival & Success* (3rd edition) (again with Siebert, published in 1996) and *The Adult Student's Guide to Survival & Success* (4th edition) (with Siebert and Karr, published in 2000). *Id* at 4-5. On September 11, 2000, Siebert registered *The Adult Student's*

---

[2] Defendants contend that *Time for College* is the second edition of *ASG* and contains a significant amount of material that was originally published in *ASG*. Siebert Decl, ¶ 4.

4 - FINDINGS AND RECOMMENDATION

*Guide to Survival & Success* (4th edition) with the United States Copyright Office ("USCO"), acknowledging Gilpin and Karr as co-authors. Hubert Decl, Ex I. Gilpin was not listed as a co-author of the subsequent (5th) edition of the book which was authored by Siebert and Karr and published in 2003. *Id*, Ex A, p. 6.

While employed by PCC, Gilpin also wrote the instructional manual titled *Teaching College Success to Older Students - An Instructor's Manual* (published in 1989) ("Instructor's Manual" or "Manual") and the workbook titled *College Survival and Success: Priming Adults Starting College* (published in 1993) ("Workbook"). *Id*, Ex A, pp. 7-8. She registered the Workbook with the USCO on October 12, 1993. *Id*, Ex G.

She then wrote the derivative Manual titled *Teaching College Success to Adult Learners - An Instructor's Manual* (3rd edition, published in 1997), which she registered with the USCO on June 8, 2004. *Id*, Ex A, p. 9, & Ex H. However, she was not listed as an author of the Manual's 4th edition (published in 2000) or 5th edition (published in 2003), both co-authored by Siebert and Karr. *Id*, Ex A, pp. 10-11.

## DISCUSSION

In her first and second claims, Gilpin alleges that defendants have infringed on her copyright of the Workbook and the Instructor's Manual (3rd edition) by copying and publishing large portions of them in the 4th and 5th editions of the Instructor's Manual. In her third claim, she alleges defendants failed to account for her share of royalties from *The Adult Student's Guide to Survival & Success* (5th edition), although a large part of the book was derived from previous editions of the book which she co-authored.

Defendants move for summary judgment against all claims on the basis that Gilpin has

no standing because she does not own the copyrights to any of the works which were "made for hire." Even if Gilpin has standing, defendants also seek partial summary judgment against those specific claims which she repudiated in her deposition.

## I. <u>Legal Standard</u>

"Copyright is a creature of statute, and the only rights that exist under copyright law are those granted by statute." *Silvers v. Sony Pictures Entm't, Inc.*, 402 F3d 881, 883-84 (9th Cir), *cert denied*, 126 S Ct 367 (2005). Under the 1976 Copyright Act, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 USC § 501(b).

To establish infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Rice v. Fox Broad. Co.*, 330 F3d 1170, 1174 (9th Cir 2003), citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 US 340, 361 (1991). To show ownership of a valid copyright, a plaintiff bears the burden of proving that the work as a whole is original and that he or she has complied with the statutory formalities. *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F3d 807, 813 (1st Cir 1995), *aff'd by an equally divided court*, 516 US 233 (1996). To prove that original elements of the work were copied, a plaintiff may show that the works in question "are substantially similar in their protected elements" and that the infringing party "had access" to the copyrighted work. *Metcalf v. Bochco*, 294 F3d 1069, 1072 (9th Cir 2002).

Copyright ownership "vests initially in the author or authors of the work" unless the work is "made for hire." 17 USC § 201(a)-(b). A work is "made for hire" if it is "prepared by an

employee within the scope of his or her employment." 17 USC § 101. In that event, "the employer or other person for whom the work was prepared is considered the author for purposes of this title and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 USC § 201(b).

The Copyright Act does not define the scope of employment. *Saenger Org., Inc. v. Nationwide Ins. Licensing Assoc., Inc.*, 119 F3d 55, 60 (1st Cir 1997). However, the Supreme Court has found that Congress intended to incorporate common law agency principles, as defined in the RESTATEMENT (SECOND) OF AGENCY (1958), to decide whether an employee has created a work within the scope of his or her employment under 17 USC § 101(1). *Cmty. for Creative Non-Violence v. Reid*, 490 US 730, 739-740 (1989). Under the RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958), a work is prepared within the scope of one's employment if it meets a three-prong test: (1) it is the kind of work the author is employed to perform; (2) the creation of the work occurred substantially within authorized work hours and space; and (3) the creation of the work was actuated, at least in part, by a purpose to serve the employer. This determination necessitates not only a case by case evaluation, but potentially a task by task evaluation. *See Pittsburg State Univ. v. Kansas Bd. of Regents*, 2005 WL 3005554 at *11 (D Kan, Nov. 10, 2005), citing Wadley & Brown, *Working Between the Lines of Reid: Teachers, Copyrights, Work-For-Hire and a New Washburn University Policy*, 38 Washburn LJ 385, 404 (1999).

///

///

## II. __Analysis__

7 - FINDINGS AND RECOMMENDATION

Because Gilpin was an employee of PCC, the first issue is whether the original *Time for College*, Workbook and Instructor's Manual were written in the scope of her employment. If so, then the second issue is whether any express agreement between Gilpin and PCC assigns all the rights in those works to Gilpin.

### A. <u>Whether the Works were "Made for Hire"</u>

To own a valid copyright in derivative works,[3] a person must own a copyright in the original work because the owner of the original work has exclusive rights to copy it and to prepare derivative works based on it. 17 USC § 106; *see also Avtec Sys., Inc. v. Pfeiffer*, 21 F3d 568, 572 (4th Cir 1994) (citation omitted). "In judicial proceedings, a certificate of copyright registration constitutes prima facie evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid." *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F2d 1104, 1106 (9th Cir 1990). Because Gilpin has presented certificates of copyright registration for the works at issue or their derivatives (Hubert Decl, Exs G, H, & I), defendants have the burden to prove that Gilpin's copyrights in the original works are not valid.

Defendants argue that all of the works are "made for hire" because Gilpin taught PCC classes, developed the works using PCC students, staff, and resources, and intended to benefit PCC. As discussed below, this court finds that either the factual record is insufficient or contains genuine issues of material fact so as to preclude determining by summary judgment whether any of the works were "made for hire."

### 1. <u>*Time for College* and Derivative Works (Third Claim)</u>

---

[3] A derivative work is a "work based upon one or more preexisting works, such as a translation ... or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" 17 USC § 101.

Gilpin co-wrote *Time for College* and its 2nd edition with Siebert while she was employed at PCC. The subsequent 3rd and 4th editions were also derived from *Time for College* and listed Gilpin as a co-author, but were published after she had retired from PCC. According to Gilpin, defendants published a 5th edition of the book utilizing much of the material Gilpin had contributed or co-written in earlier editions. Whether *Time for College* is a work "made for hire," such that Gilpin holds no copyright interest in it or its derivative works, depends on whether it was written in the scope of Gilpin's employment at PCC.

Undisputed material facts establish that Gilpin created *Time for College* at least in part in order to serve PCC. While looking for materials to teach the course "College Survival and Success," she ran across *ASG* that Siebert and Walter had written in 1982 and, concluding that many items in the book were missing as far as answering the needs of adult students, she wrote a letter to Siebert about the book and her ideas. Gilpin Depo, p. 10. The two decided on a collaboration to write a book that would address the needs of adult students and co-wrote *Time for College. Id* at 10-11. Gilpin gave extra credit for students in her class who critiqued her book chapter by chapter before it was published. *Id* at 18-21. Gilpin explained that she "gave it to students who wanted to critique materials *that were to be used in the future*." *Id* at 21-22 (emphasis added). In fact, *Time for College* was used for the class after it was published. *Id* at 18.

However, as discussed below, genuine issues of material fact exist as to whether *Time for College* is the kind of work Gilpin was employed to perform at PCC and whether it was created substantially within authorized work hours and space.

### a. <u>Kind of Work Employed to Perform</u>

Written job duties are an obvious starting point in deciding whether creating the work at issue was the type of work Gilpin was employed to do. For example, in *Vanderhurst v. Colorado Mtn. Coll. Dist.*, 16 F Supp 2d 1297, 1307 (D Col 1998), the court relied on a college policy to find that class outlines developed by a junior college instructor were fairly and reasonably incidental to his employment. The policy delineated the duties of faculty members, including "course, program and curriculum development [and] course preparations." *Id.*

Gilpin's job requirements as a counselor for PCC are set forth in the September 1, 1989 - August 31, 1992 Union Agreement which states in pertinent part:

> 10.4. Counselors, consistent with the requirements and standards of the department and the qualifications of the individual Counselor, shall:
> 10.41 Be responsible for counseling and guiding any assigned or requesting students . . . in meeting their respective educational, personal, social and vocational goals . . .
> 10.43 Administer and/or interpret appropriate standardized tests . . . .
> 10.45 Assist Management in revising, updating and evaluating career exploration and testing programs,
> 10.46 Provide consultative support services to College staff.
> 10.47 Provide group counseling sessions, seminars, workshops and *career or personal development classes*. The individual Counselor's preference shall be given serious consideration in making assignments. *Assignments to career or personal development classes shall not exceed 20 percent of the term workload*, without the consent of the individual Counselor.

Hubert Decl, Ex K (emphasis added).

The September 1, 1986 - August 31, 1989 Union Agreement adds the following language in Section 10.47: "Provide group counseling sessions, seminars, workshops and career or personal development classes *with reasonable time allowed for preparations*." *Id*, Ex J (emphasis added). Although Section 10 in both Union Agreements allows individual

departments to require more specific job assignments, the record does not include any such additional job duties required by Gilpin's department.

One of Gilpin's job duties was to teach career or personal development classes. The job duties of PCC teaching faculty, in contrast to counselors, include the duty to "[r]evise/develop courses and curriculum" and "[i]nstruct students, using approved course content guides developed by Collegewide subject area Faculty." *Id*, Exs J & K, ¶¶ 10.22 & 10.23. If a teaching faculty develops *new* courses or makes *major* revisions to existing ones, then he or she receives either released time or additional compensation as long as the type of compensation is specified before agreeing to accept the assignment. *Id*, ¶ 11.2372 (emphasis added). Gilpin, however, received no additional compensation from PCC for any of her works. Gilpin Decl, ¶ 12. The Union Agreements are silent on what is expected of PCC counselors when they teach career or personal development classes. Whether counselors are subject to the same duties as teaching faculty, namely to revise/develop courses, and whether revising and developing courses includes writing a student guidebook such as *Time for College,* cannot be determined from the record.

According to Comment b to RESTATEMENT (SECOND) OF AGENCY § 229 (1958), acts incidental to authorized acts may be authorized as within the scope of employment:

> An act may be *incidental to an authorized act*, although considered separately it is an entirely different kind of act. To be incidental, however, it must be one which is *subordinate to or pertinent to* an act which the servant is employed to perform. *It must be within the ultimate objective of the principal and an act which it is not unlikely that such a servant might do.* The fact that a particular employer has no reason to expect the particular servant to perform the act is not conclusive.

*Id* (emphasis added).

Applying Comment b, some courts have broadly interpreted incidental acts, increasing the copyrights of employers. In *Genzmer v. Public Health Trust of Miami-Dade County*, 219 F

Supp 2d 1275, 1282 (D Fla 2002), the court held that a computer program developed by a medical research fellow was incidental to his job duties. As part of his fellowship duties, the research fellow was required to complete a six-month research assignment which could encompass "a myriad of activities" and, at times, such research had included computer programs. *Id* at 1281. Moreover, the job description stated that fellows would acquire skills required to organize, administer and direct a critical care unit, and the computer program fell under this description because it organized care information in a manageable way. Similarly, in *Miller v. CP Chem., Inc.*, 808 F Supp 1238, 1243 (D SC 1992), a computer program designed by a chemical lab supervisor was found to be incidental to his job duties where the supervisor was responsible for organizing and updating the laboratory and the computer program helped with organization.

On the other hand, *Quinn v. City of Detroit*, 988 F Supp 1044, 1051 (ED Mich 1997) found that designing computer programs was not the kind of work that a managing attorney for a city's law department was hired to perform. The job description did not require him to create computer software; his employer never requested him to develop it; he had no prior programming experience; and the city had its own computer programming department to do the kind of work the attorney decided on his own to do.

Applying Comment b in this case does not resolve the issue. Writing a student guidebook aimed at helping older students return to college is certainly pertinent to teaching personal development and career classes at PCC. However, it is unclear whether writing the book is within the ultimate objective of Gilpin's job. She was not asked to write the book. In fact, the only writing PCC asked of Gilpin was an administrative report on a program she was

running. Gilpin Depo, p. 10. The record does not reveal whether it is unlikely that a PCC counselor might write a personal development book. In fact, it may be so unlikely that no remuneration was made available. Certainly a counselor, whose main objective is not teaching, may fulfill her teaching duty by using textbooks written by others rather than having to write them herself. The record is insufficient to resolve this issue at this time.

### b. Occurring Substantially Within Authorized Time and Space

The parties disagree whether Gilpin made significant use of PCC resources in co-writing *Time for College*. Gilpin co-wrote *Time for College* at home on her home computer outside of normal work hours; in fact, she did not even have a work computer. Gilpin Depo, pp. 98-100.[4] Defendants argue that because the work hours of a professor are quite fluid, even work done at home can be considered within the authorized work time and space limits. As noted by the Second Circuit, "the very nature of a teacher's duties involves a substantial amount of time outside of class devoted to preparing lessons, problem sets, and quizzes and tests – which is clearly within the scope of employment." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F3d 177, 186 (2nd Cir 2004).

The Union Agreements dictate that counselors have a 35-hour workload per week and "where travel and off-campus activities are required by the Department Administrator, the time required will be included in the workweek." Hubert Decl, Exs J & K, ¶ 11.31. Without consent, the counselors' assignments to career or personal development classes are not to exceed 20% of the term workload. *Id* at ¶ 10.47. This placed a cap on the amount of teaching and preparation for teaching that PCC authorized counselors to do. Gilpin admitted that she spent "a lot of

---

[4] Although these pages cited by Gilpin were not provided to the court as part of the record, defendants have not disputed the assertion that she used her home computer to write *Time for College*.

additional time" at home "preparing for classes, for counseling and for her job," and that she considered these additional hours as part of her mission as an educator, although she did not report them to PCC. Gilpin Depo, pp. 102-03.

While the authorized work hours of a PCC counselor may well be fluid, they are not unlimited. They depend on the customary number of additional hours (if any) that PCC expects of its counselors for them to be able to perform their job. Any broader reading would mean authorizing counselors to work day and night and blurring any lines left between one's professional life and personal endeavors. When asked about the school's expectation of teachers and counselors working additional hours, Gilpin explained:

> I can't say that the school expected me to put in a lot of time after hours away from the college. I was evaluated on my performance as a counselor and as an instructor. I think you have copies of some of those evaluations. But as to whether they said, I expect you to read so many books or I expect you to go for this professional qualification, I was not told that.

*Id* at 103-04.

At this juncture, the facts are insufficient to ascertain whether Gilpin created these works substantially within her authorized work hours and space.

///

///

///

## 2. Instructor's Manual and Derivative Works (First Claim)

### a. Kind of Work Gilpin was Employed to Perform

Gilpin wrote the first Instructor's Manual while employed by PCC. Gilpin Depo, p. 26. It contained lesson plans (or "vignettes") inspired by various courses Gilpin had taught, both at

PCC and in elementary school. *Id* at 27. Gilpin field-tested the vignettes in "various teaching" she had done, including her training with the Portland Urban Teachers Training Project where she taught the 6th through the 8th grades. *Id.* Gilpin either tried the vignettes "in [her PCC] class or [she] had been told by special training that this particular method worked particularly well." *Id*.

Common sense dictates that one who teaches a class, no matter what job title (professor, teacher, instructor or teaching assistant), is expected to prepare for that class. The methods of preparation are varied, whether by reading about the subject, taking mental notes, outlining a lecture, writing out a lesson plan, *etc*. Such methods of preparation for teaching have been held to be incidental to employment as a teacher. *Vanderhurst*, 16 F Supp 2d at 1307 (class outlines of a junior college instructor were fairly and reasonably incidental to his employment); *Shaul*, 363 F3d at 186 (tests, quizzes and homework problems were the kind of work a high school math teacher was required to prepare in his official duties as a teacher).

If this dispute were over the copyright of lesson plans Gilpin had designed in preparation for teaching her PCC classes, then this court would conclude that they fall within the kind of work she was hired to do. However, it is unclear from the record what portion (if any) of the first Instructor's Manual is comprised of lesson plans Gilpin designed for the purpose of achieving her PCC teaching duty and what portion was inspired by various other experiences and training. Due to questions of fact, summary judgment is precluded on this issue.

### b. Occurring Substantially Within Authorized Time and Space

According to Gilpin, she did not write the first Instructor's Manual during official work hours and did not use the completed book in her classes. Gilpin Depo, p. 26; Gilpin Decl, ¶ 8.

However, she did try some of the vignettes in the Manual in her PCC classes, which would be during authorized time and within authorized space of her job. The facts do not reveal how much time Gilpin spent creating the Manual in her classes as opposed to outside her official work hours. Whether a substantial percentage of the Manual's creation took place within PCC's authorized time and space limits is unclear and cannot be resolved at this point.

### c. Purpose to Serve PCC

Whether the Manual was created, at least in part, by a purpose to serve PCC depends on a number of factors. For example, in *Miller*, 808 F Supp at 1243, a computer program was held to have been created at least in part to serve the employer where it was designed to simplify the employee's job and to eliminate errors, was requested by the employer, and was tailored to the employer's products. *See also Genzmer*, 219 F Supp 2d at 1282-83 (computer program was actuated to serve the employer where it was tailored to fit the employer's needs and, once complete, it was used by the employer).

No evidence supports a finding that Gilpin developed the Manual to simplify her job or the jobs of other instructors at PCC. To the contrary, Gilpin's stated purpose for writing the Manual was "for other instructors who were teaching the course, you know, away from the college." Gilpin Depo, p. 89.

However, it is not clear whether the Manual was written at least partly to benefit PCC. Controversy surrounds the status of 100 copies of the Manual made and distributed by PCC's Instructional Materials Center at PCC expense "for promos" prior to its publication. *Id* at 89-90. In her deposition, Gilpin testified that PCC made the copies "[t]o send out to people who might be interested in teaching the course." *Id*. As part of her job, Gilpin made presentations at adult

learner conferences around the United States and Canada, where she addressed groups such as representatives of companies that were laying off a large group of people and were interested in "reschooling" them. *Id* at 95-97. She believed that talking to people who wanted to create such a course "might very well have been the reason for having copies of the instructor's manual run off." *Id* at 95-96. Sometimes it was appropriate to use materials she had written in her presentations; other times it was not. *Id* at 95. However, in her declaration, Gilpin clarified that the 100 copies were made by and for PCC at its request "for promotional material to advertise classes taught at PCC for adult learners" and "for dissemination for that express purpose." Gilpin Decl, ¶ 11.

By using the Manual at PCC's request before it was published in presentations at conferences, Gilpin likely benefitted PCC's image. If used to advertise classes taught at PCC, then it clearly served PCC's purposes. However, according to Gilpin, she did not write the Manual for PCC. Instead, PCC took advantage of the Manual as a promotional material after it was written. Therefore, it does not directly follow that Gilpin *wrote* the Manual with the intent to benefit PCC. In sum, Gilpin's testimony creates a factual dispute as to whether she wrote the Manual at least in part to serve PCC.

///

### 3. *College Survival and Success* **Workbook and Derivative Works (Second Claim)**

Undisputed material facts establish that Gilpin created the Workbook at least in part in order to serve PCC. Gilpin published the Workbook in 1993 to accompany *Time for College* and "for students to use along with the text." Gilpin Depo, p. 34. Gilpin intended to use this material in the PCC class she was teaching. *Id.* It "was meant to clarify material in [*Time for*

*College*] and to help the student get a clearer idea of what it would take to succeed in college."
*Id.*  She also intended this book to be available at PCC.  *Id* at 36.

However, as discussed below, genuine issues of material fact exist as to whether the
Workbook is the kind of work Gilpin was employed to perform at PCC and whether it was
created substantially within authorized work hours and space.

### a.  Kind of Work Gilpin was Employed to Perform

Siebert states that the Workbook published in 1993 was actually created by Gilpin in
1991 as a packet of course materials for her class "College Survival and Success," course
number CG-100.  Siebert Decl, ¶ 6.  Although Gilpin agrees that the 1991 course materials were
assembled and developed for her class, she states that they were not a workbook, but rather an
assembly of notes and handouts to help her students follow along with her class presentation.
Gilpin Decl, ¶ 12.  While some of the concepts in the 1991 course materials may be
encompassed in her later writings, the 1991 course materials did not become her 1993 published
Workbook.  *Id.*

Although defendants have submitted a copy of the 1991 course materials (Siebert Decl,
Ex A), a copy of the Workbook is not in the record.  Therefore, the court cannot compare the
contents and determine how similar they are.  If the Workbook is simply a copy of Gilpin's 1991
course materials, then based on such persuasive authority as *Vanderhurst* and *Shaul*, it may be
considered incidental to Gilpin's duties.  However, the contrary statements by Siebert and Gilpin
create a factual dispute which cannot be resolved on summary judgment.

### b.  Occurring Substantially Within Authorized Time and Space

Gilpin admits that some of the 1991 course material exercises were incorporated into the Workbook. Gilpin Decl, ¶ 15. While she likely wrote the 1991 course materials within PCC's authorized time and space limits while preparing for her class, the Workbook took approximately one year to write, and she did much of the writing during her six-month sabbatical from PCC. *Id* at ¶ 12. Defendants have produced no evidence to support their theory that PCC granted Gilpin a sabbatical to develop the Workbook. It is also unknown what expectations PCC has of its counselors while on sabbatical.[5]

In her deposition, Gilpin stated that she gave PCC students credit in her class to perform and critique exercises included in this Workbook. Gilpin Depo, p. 36. However, she clarifies in her later declaration that she was confused in her deposition as to which work was being discussed and that she had students critique, for extra credit, some of the exercises incorporated into the course materials for CG-100, but not the Workbook. Gilpin Decl ¶ 15. Based on that clarification, this court accepts the fact that PCC students were not given credit in class to critique the Workbook. However, if the students critiqued the course materials which were then incorporated into the Workbook, then the creation of the Workbook used PCC's resources.

///

Gilpin also admits using PCC personnel to review, edit and assist her in developing the Workbook, including PCC secretary Marcia House, the Office of Business Disabilities staff, the reference librarian, the career resource coordinator, and another counselor at PCC. Gilpin Depo, pp. 37-43. While some of the meetings with PCC staff were held during the lunch hour in the

___

[5] The Declaration of Leonard D. Duboff does not assist the court since it pertains to a sabbatical taken by a law school professor, not a counselor/instructor at PCC.

college cafeteria, which is a public place, other meetings took place in PCC authorized work spaces (the library, the counseling office area, and PCC staff offices). *Id* at 38-43. However, the contributions by PCC staff were done on their own time, not PCC time. *Id.* This court rejects defendants' suggestion that assistance to Gilpin provided by PCC employees during their free time, even though on the PCC campus, is a use of PCC's resources.

Gilpin also admits sending Siebert a form typed on PCC stationary asking his permission to use a concept initially developed by him for inclusion on page 38 of the Workbook. *Id* at 6. However, in the absence of any formal legal knowledge, she simply utilized a pre-printed generic permission form that PCC used for copyright purposes that she believed would be suitable for her. Gilpin Decl, ¶ 13.

Gilpin clearly did use some PCC resources when creating the Workbook. However, the issue is whether she created the Workbook substantially within PCC's authorized time and space limits. That issue simply cannot be resolved given the current record with its factual disputes and gaps in the evidence.

### B.  Whether A Contract Gave Gilpin Copyright Ownership

If the works at issue were not "made for hire," then the analysis ends and Gilpin is the owner of the copyrights. However, if one of the works was "made for hire," then the second part of the analysis is whether Gilpin's employment contract with PCC satisfies the requirements of 17 USC § 201(b).

Article 28 of the Union Agreements (incorporated in Gilpin's employment contract) addresses the ownership of patents and copyrights. Hubert Decl, Ex M. Gilpin would receive copyright ownership of materials developed "*solely* by [her] individual effort and expense,"

while PCC owns the copyright to materials produced "*solely* for the College and at College expense." *Id*, §§ 28.11 & 28.12.  As discussed above, Gilpin did not develop the materials solely by herself, but did utilize some PCC resources, and the materials were not developed solely for PCC at its expense.

Therefore, the analysis turns to § 28.13 of the Union Agreement covering "those instances where materials or processes are produced by an employee with college support, by way of use of significant personnel time, facilities, or other college resources."  First, as discussed above, issues of fact exist as to whether Gilpin used "significant personnel time, facilities, or other college resources" to develop the works.  Second, if she did, then PCC owns the copyright unless Gilpin was designated as the owner "by written agreement between the parties entered into prior to the production."  Because no such agreement has been introduced in the record, this section would not apply.  Therefore, pursuant to 17 USC § 210(b), PCC would own the copyrights of any work at issue which was "made for hire."

### C.      Whether Gilpin Repudiated her Claim as to Certain Infringements

Even if Gilpin owns the copyrights and has standing to bring this suit, defendants also move for partial summary judgment on the claims of infringement by several passages in the works at issue on the basis that Gilpin later repudiated her claims with regard to those passages.

In their first set of interrogatories, defendants asked Gilpin to specify her claims of infringement.  James Decl, Ex F.  Gilpin responded to these interrogatories with a chart which showed her original contributions to the works and the corresponding passages allegedly infringing upon her copyrights.  *Id*, Ex G.  During her deposition, Gilpin admitted that several passages she had previously identified as infringing were substantially similar to the 1982 *ASG*,

which was written by Siebert and Walter without Gilpin's contribution.  Gilpin Depo, pp. 78-85.

Gilpin also admitted the following fact in Defendants' Concise Statement of Material Facts:

> Gilpin submitted responses to interrogatories listing the specific infringing and infringed passages in each of the works.  At her deposition, she repudiated her claim of copyright infringement as to at least four of those passages.  James Decl, Exs F and G,  Gilpin Depo 78:7-85:15.

Based on her deposition testimony and admission, defendants' motion for partial summary judgment as to passages identified in Gilpin's deposition testimony should be granted.

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*///*

*///*

## **RECOMMENDATION**

For the reasons stated above, the defendants' motion for summary judgment (docket #29) should be DENIED IN PART (as to plaintiff's standing) and GRANTED IN PART (as to claims repudiated by plaintiff)..

## **SCHEDULING ORDER**

22 - FINDINGS AND RECOMMENDATION

Objections to these Findings and Recommendation, if any, are due February 13, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then the response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 25th day of January, 2006.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge